## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

SCIOLEX CORPORATION )
)
       *Plaintiff,* )    Civil Action No. _____
)
vs. )
)
HARTFORD FIRE INSURANCE )
COMPANY, HARTFORD ACCIDENT )
AND INDEMNITY COMPANY, and )
HARTFORD INSURANCE COMPANY OF )
THE MIDWEST )

       *Defendants.*

## COMPLAINT

Plaintiff, Sciolex Corporation ("Sciolex"), as and for its Complaint against the Hartford Fire Insurance Company ("HFIC"), the Hartford Accident and Indemnity Company ("HAIC"), and the Hartford Insurance Company of the Midwest ("HICM" and, together with HFIC and HAIC, the "Defendants"), alleges as follows:

### NATURE OF PROCEEDINGS

1. This is an action for declaratory judgment and money damages, arising from breach of workers' compensation insurance policies issued by Defendants doing business as The Hartford, and for negligent and intentional misrepresentations and unfair insurance and trade practices.

2. In 2023, in an attempt to justify a belated and dramatic premium increase with respect to a policy that had terminated in 2022, Defendants wrongfully reclassified hundreds of Sciolex employees as "warehouse" workers, knowing full well that for at least four immediately

preceding policy periods (covering June 1, 2017 through May 31, 2021), they were properly

classified as "clerical" workers as evidenced by Defendants' and their agents' own audit records.

3.      Defendants and their agents refuse to retract their reclassification and its related

exorbitant premium charge, which has caused substantial damage to Sciolex.

## PARTIES

4.      Sciolex is a stock corporation organized and existing under the laws of the State

of Virginia, with a principal office address at 4511 Singer Ct., Ste. 100, Chantilly, VA, 20151,

and additional office locations across the country.

5.      HFIC is a corporation organized and existing under the laws of the State of

Connecticut, with a principal place of business at One Hartford Plaza, Hartford, Connecticut

06115.  HFIC has designated CT Corporation System as its agent for service of process with an

address at 357 East Center St., Ste. 2 J, Manchester, CT 06040.

6.      HAIC is a corporation organized and existing under the laws of the State of

Connecticut, with a principal place of business located at One Hartford Plaza, Hartford,

Connecticut 06115.  HAIC has designated CT Corporation System as its agent for service of

process with an address at 357 East Center St., Ste. 2 J, Manchester, CT 06040.

7.      HICM is a corporation organized and existing under the laws of the State of

Illinois, with a principal place of business located at 201 N Illinois St., 16th FL, Indianapolis, IN

46204.  HICM has designated CT Corporation System as its agent for service of process with an

address at 334 North Senate Avenue, Indianapolis, IN, 46204.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1332(a)(1) insofar as there is complete diversity of citizenship between Plaintiff and each of the

2

Defendants and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

9.    This Court has personal jurisdiction over HFIC and HAIC because they reside in the District of Connecticut.

10.    This Court has personal jurisdiction over HICM because it has intentionally and deliberately engaged with the District of Connecticut in each of the following ways: (i) HICM is a member insurance company of and collectively provided coverage with HFIC and HAIC under the insurance policies issued by The Hartford Insurance Group, Inc., which has its principal place of business in Hartford, Connecticut; (ii) HICM's officers are identified as Andre A. Napoli, President, Terence Shields, Secretary, and Robert W. Paiano, Treasurer, all with addresses at The Hartford, One Hartford Plaza, Hartford, CT 06155; (iii) HICM purports to have audited Sciolex and seeks to charge Sciolex increased insurance premiums based upon that audit under the tradename and trademark "The Hartford," the registered owner of which is HFIC, a corporation domiciled in the District of Connecticut; (iv) all correspondence sent to Sciolex by HICM seeking to charge an excess premium for the policy issued on its behalf was authored by its agent, Deborah Ricker, and bears the address 690 Asylum Avenue, Hartford, CT 06155; (v) the additional premium charged under the HICM policy that is the subject of this action was set forth on billing correspondence issued by HFIC, a Connecticut Corporation, and (vi) the Defendants, under the trademark "The Hartford," issued a consolidated invoice for the increased premium charge at issue in this litigation on February 21, 2024 on behalf of HFIC, HAIC and HICM.

11.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (3) because HFIC and HAIC are residents of the District of Connecticut, HICM is subject to this

Court's personal jurisdiction, and the acts complained of herein occurred, at least in part, in this District.

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

12.    Sciolex was founded in February 2006 by Kevin Miller, a service-disabled veteran who served in the U.S. Army for over twenty years as a technical specialist and Special Operations Intelligence Officer. Sciolex is a federal government contractor that provides technical and administrative support, engineering, and program management to agencies such as the Department of Defense and Department of Homeland Security ("DHS").

13.    To obtain contracts with DHS, Sciolex historically responded to requests for proposals ("RFPs") and entered a competitive bidding process. The bidding process required Sciolex to submit detailed proposals, including specification of its qualifications to perform the work and proposed pricing.

14.    On July 28, 2016, as a result of years of successful bidding and the provision of high quality, reliable services, Sciolex was awarded a preferred bidding status that narrowed the competition for certain DHS contracts known as DHS Program Management, Administrative, Operations (Clerical), and Technical Services II (PACTS II) Indefinite Delivery Indefinite Quantity (IDIQ) Contracts. A subset of such PACTS II Contracts, known as "Functional Category 2," for administrative operations services, financial planning, personnel, billing, recordkeeping and court reporting and stenotype services ("Category 2 Contracts"), was specifically reserved for 100% Service-Disabled Veteran-Owned Small Businesses, such as Sciolex.

15.    As a preferred contractor, Sciolex was one of only fifteen firms that could bid on Category 2 Contracts and it was awarded nearly all of the Category 2 Contracts for which it submitted bids.

4

16.     Sciolex experienced significant business growth between 2016 and 2021. To perform the work and provide the services required by the Category 2 Contracts, Sciolex's workforce expanded from approximately 40 employees beginning in 2016 to approximately 1300 employees in 2021.  Sciolex's workforce growth occurred at all locations, including in the states of California, Vermont, and the District of Columbia, due in large measure to its success bidding on and winning Category 2 Contracts.

17.     Beginning in 2006, Defendants and Sciolex entered into a series of insurance contracts or policies (collectively, the "Policies") pursuant to which workers' compensation insurance was provided to Sciolex in exchange for the payment of annual insurance premiums. Over time, HAIC, HFIC and HICM became the named insurers for workers' compensation coverage provided in California, Vermont and the District of Columbia, respectively. Each of HAIC, HFIC, and HICM are member insurance companies of The Hartford Insurance Group, Inc., which has its principal place of business in Hartford, Connecticut and which, on behalf of the Defendants, issued the workers' compensation insurance at issue in this lawsuit.

18.     Each year, from 2006 through 2021, new workers' compensation insurance policies were issued to Sciolex. For each of the policies issued over that period, Sciolex promptly paid the premium charged and the policies were annually renewed.

19.     At the beginning of each policy period, a written policy form setting forth terms, conditions, endorsements, and a Schedule of Operations was provided to Sciolex. The written policy form further specified an estimated annual premium, by location, for that specific policy period.

20.     At the beginning of each policy period, Sciolex paid a deposit premium based upon the estimated annual premium.

ME1\59407226.v8

21.    At the end of each policy period, The Hartford conducted an audit to compare the exposure estimated at the beginning of the policy period to the *ex post* exposure. The Hartford then calculated and assessed a revised, final annual premium based upon the actual exposure. If the actual premium was less than the deposit paid by Sciolex at the outset of the policy period, a refund was made by The Hartford to Sciolex. If the actual premium was more than the deposit, Sciolex was billed for and paid the difference.

22.    To calculate the premiums due for each policy period, The Hartford used several classifications for Sciolex's various locations and classes of employees.  These classifications grouped employees by similar work risks and injury exposure, based on the operations of the business and the individual duties of the employees.

23.    The Policies provided, in relevant part, as follows:

**A.  Our Manuals**

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications.  We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating insurance.

**B.  Classifications**

Item 4 of the Information Page shows the rate and premiums basis for certain business or work classifications.  These classifications were assigned based on an estimate of the exposures you would have during the policy period.  If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates, and premium basis by endorsement to this policy. . . .

\* \* \*

**E.  Final Premium**

The premium shown on the Information Page, schedules, and endorsements is an estimate.  The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.  If the final premium is more than the premium you paid to us, you must pay us the balance.  If it is less, we will refund the balance to you.  The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

6

24.    Upon information and belief, the "manuals of rules, rates, rating plans and classifications" referred to in the policies and used by The Hartford include the classification systems created by the National Council of Compensation Insurance ("NCCI"), for Vermont and the District of Columbia, and the Workers' Compensation Insurance Rating Bureau of California ("WCIRB") for California.

25.    With respect to the policies issued by The Hartford Insurance Group, Inc. on behalf of the Defendants, each classification had a different classification rate assigned to it, which varied by state.  Across the classifications, higher exposure to risk associated with the work performed correlated to a higher classification rate. The Hartford determined the premium due on its policies each year by multiplying payroll amounts by the classification rate.

26.    Beginning in 2017 and continuing through May 31, 2021, the Defendants or The Hartford Insurance Group, Inc., acting on their behalf, classified Sciolex's PACTS II employees as "8810-01 Clerical Office Employees – NOC" ("Clerical"). Clerical employees were described by the Defendants or their agents as "corporate office employees working out of the offices owned by [Sciolex].  These employees handle general [administrative] operations consisting of accounting, billing, reception, inside sales, HR, IT, and general [administration] management. This code also included employees working on client sites.  These employees provide [administrative] and IT services, management, and analysis work. . . ."  The Clerical employee classification generally denoted employees with a lower degree of exposure to risk.

27.    Beginning in 2017 and continuing through May 31, 2021, the Defendants or The Hartford Insurance Group, Inc., acting on their behalf, considered the Clerical employee classification appropriate for Sciolex's PACTS II employees insofar as they performed administrative and clerical duties. Sciolex's PACTS II employees worked exclusively at desks in

7

a designated cubicle or in an office space physically separated from exposure to any operative hazards. Excepted from this "Clerical" classification were only a handful of employees who were classified as "7380-01 Drivers & Helpers NOC – Commercial."

28.    The Clerical employee classification applied by the Defendants or The Hartford Insurance Group acting on its behalf comported with the classification system created by the NCCI and the WCIRB, as follows:

(a)    The NCCI provides that the "[d]uties of employees assigned to Code 8810 must be limited to one or more of the following activities: create or maintain employer records, correspondence, computer programs, or files; perform telephone duties, including telephone sales; perform data entry or word processing; operate a photocopier or fax machine, . . . or perform other similar office work." "Workstations for employees assigned to Code 8810 must be physically separated from exposure to operative hazards by acceptable physical barriers."

(b)    The WCIRB defines Clerical employees as "employees whose duties are confined to keeping the books, records or cash of the employer; conducting correspondence; using computers; dispatching; recording weights; or who are engaged wholly in general office work or office drafting, having no regular duty of a non-clerical nature in the service of the employer. . . . [These employees] work exclusively in areas that are separated from all other work places of the employer by buildings, floors, partitions, railings or counters and within which no work is performed other than clerical office or drafting duties defined in this Rule . . . ."

29.     Annually, during the period 2009 through 2021, The Defendants or their predecessor insurers acting through The Hartford Insurance Group, Inc. audited Sciolex and either issued a refund or billed an additional premium to account for the difference between the estimated and actual exposure. Sciolex was occasionally billed an additional premium due to increases in payroll attributed to Sciolex's business development and workforce growth. Such additional premiums were promptly paid by Sciolex.

30.     On March 21, 2022, The Hartford Casualty Insurance Company, another member company of The Hartford Insurance Group, Inc., abruptly issued, on behalf of each of the Defendants, a Notice of Nonrenewal of the workers' compensation insurance policies issued to Sciolex (the "Notice"). The Notice provided that "[t]he reason for nonrenewal is the loss experience on this policy has exceeded a level that The Hartford considers to be acceptable. The ratio of losses to premium on your policy is 183.5% for the past three years."

31.     The Notice came as a surprise to Sciolex insofar as neither the Defendants nor their agents had ever previously indicated any issue, concern or dissatisfaction with Sciolex's insurance claims or loss experience under the any of the policies issued to Sciolex.

32.     Eleven months after the Notice, on February 24, 2023, a final audit for the policy period June 1, 2021 to June 1, 2022 (the "2023 Audit") was issued. The 2023 Audit did not identify a specific named insurer on any of the workers' compensation insurance policies at issue, instead referring to the carrier generically as "The Hartford."

33.     The 2023 Audit identified employees by classification across Sciolex's multiple locations, the estimated exposure, the final exposure, and the exposure variance. For the first time, "The Hartford" reclassified hundreds of PACTS II employees from Clerical to "8018 –

ME1\59407226.v8

Store Wholesale NOC" ("8018") in Vermont and the District of Columbia and "8292 Warehouse – General Merchandise – N.O.C." in California ("8292").

34.    As set forth in the 2023 Audit, the 8018 classification is described as "used for warehouse/documents storage employees in [Vermont] and [the District of Columbia]."

35.    As provided by the NCCI, the 8018 Classification (the warehouse classification) is a catch-all category that focuses on the employer's operations to assess the level of exposure common to that type of employer.  This applies to employees who perform the core operations of the employer, rather than the individual occupations of employees like the Clerical classification. The 8018 classification specifically applies to business operations that are engaged in the wholesale selling of certain merchandise.  It further provides: "wholesale operations [under this classification] generally include the maintenance of warehouse inventories; the physical assembling, sorting, and grading of goods; the breaking of bulk quantities and repackaging into smaller lots; and the promoting of sales through utilization of an outside sales force."

36.    The 8292 classification is specific to California but similarly is a general classification based on the exposure common to the operations of the employer. The WCIRB provides: "This classification applies to the storage of general merchandise, including new furniture, for separate concerns on a fee basis when no other classification more specifically describes the operations. This classification also applies to document storage, the storage of portable storage units regardless of their contents, or the crating of merchandise on a fee basis." Collectively, the 8018 and 8292 classifications are referred to herein as "Warehouse."

37.    The 2023 Audit failed to provide any explanation as to why hundreds of Sciolex's PACTS II employees, who had been classified as Clerical for the immediately preceding four

policy periods, were for the first time suddenly reclassified as "Warehouse" eleven months after The Hartford terminated Sciolex's workers' compensation insurance coverage.

38.     The Warehouse classification had never been applied to *any* of Sciolex's employees before the 2023 Audit. Further, the operations described by the Warehouse classifications, as provided by the NCCI and the WCIRB, does not apply Sciolex's operations.

39.     With respect to the PACTS II employees in California, the 2023 Audit specifically described the auditor's efforts to ascertain the duties of the PACTS II employees during the course of the audit and that he "was told that all employees are performing clerical duties (except drivers) on client sites in California." The 2023 Audit failed to reconcile the duties of the PACTS II employees in California as reported to the auditor with the auditor's decision to reclassify those employees from "Clerical" to "Warehouse."

40.     On May 24, 2023, based substantially upon its reclassification of employees, and to a much lesser extent upon the growth of Sciolex's workforce, the Hartford Casualty Insurance Company issued a "Statement of Premium Adjustment – Final Audit" on behalf of all Defendants for the period June 1, 2021 through June 1, 2022 ("2023 Statement").  The 2023 Statement provided that the original estimated premium for the policy period was $93,662.00 and the audited actual premium was $1,732,956.00, resulting in an additional premium of $1,695,983.00.

41.     As reflected by the 2023 Statement, the classification rate assigned to the Warehouse classification was drastically higher than the classification rate assigned to Clerical.

(a)     For California, the classification rate for Warehouse was 15.950 per $100 and 0.4300 per $100 for Clerical.

(b)     For the District of Columbia, the classification rate for Warehouse was 4.2000 per $100 and 0.0900 per $100 for Clerical.

(c)     For Vermont, the classification rate for Warehouse was 10.490 per $100 and 0.2500 per $100 for Clerical.

42.     Upon receiving the 2023 Statement, Sciolex immediately initiated communication with representatives of the Defendants in order to understand and challenge the grounds for the retroactive reclassification and additional premium. Defendants, through their agents, insisted that their reclassifications were appropriate, and the premium adjustment was due and payable.

43.     On or about August 10, 2023, (i) in order to stave off threatened collection actions and legal proceedings initiated by The Hartford, (ii) in order to maintain its insurability, (iii) in reliance upon the representations made by Defendants through their agents that the reclassifications were appropriate, and, further, (iv) recognizing that it had experienced workforce growth during the final policy period, Sciolex made a "good faith" payment to The Hartford in the amount of $65,000.

44.     During this time, Sciolex continued to perform work and bid on Category 2 Contracts.

45.     As a result of Defendants' reassessments, however, Sciolex was obligated to factor the reassessed premiums and related exposures into its bid packages submitted in response to RFPs for Category 2 Contracts.

46.     On or about June 11, 2024, Sciolex placed its first bid in response to an RFP for a Category 2 Contract after termination of the workers' compensation policies issued by the Defendants.

47.    Due to its prior performance ratings with respect to PACTS II contracts, including Category 2 contracts, Sciolex expected to win and should have won the RFP. As stated by the government's RFP: "This is a best value award decision; the evaluation criteria for this award will be based on the factors described below. The non-price evaluation factors are of equal importance. Price is the least important factor."

48.    Sciolex's bid on the contract had to account for the retroactive premium charged by the Defendants and their agents following the 2023 Audit and, accordingly, Sciolex's bid was priced significantly higher than its historical bids for such work. If awarded, Sciolex expected to earn a profit of at least $2 Million on this contract opportunity.

49.    Sciolex lost the RFP and related contract – an opportunity that it ordinarily would have expected to win – because, on information and belief, its bid was substantially higher than its competitor, which was awarded the contract. Sciolex had never previously lost a bid due to price, nor had it ever lost a bid for a PACTS II RFP to the party that was awarded the contract. Further, because its bid was no longer price-competitive, Sciolex was precluded from bidding on eleven other PACTS II RFPs and lost its ability to leverage its preferred status to bid on approximately $18.8 million of further PACTS II opportunities, on which it would have made a profit of at least $1.8 million.

50.    Due to The Hartford's delayed communication and lack of transparency into their audit process, the PACTS II contract's ordering period ended before Sciolex's dispute with the Defendants and their agents could be resolved, and Sciolex permanently lost its preferred bidder status with DHS on PACTS II IDIQ contracts, including Category 2 Contracts.

51.    Due to the financial strain caused by The Hartford's conduct, the remaining balance on the additional premium of $1,625,602.00, and Sciolex's inability to win PACTS II

RFPs, Kevin Miller was forced to use hundreds of thousands of dollars in personal funds to cover payroll during this period.

52.    On or around February 20, 2025, Steven Miller, Kevin Miller's son, in the position of Chief Growth Officer (CGO) at Sciolex, engaged with Defendants' auditors to understand the basis and rationale for the reclassification of Sciolex's PACTS II employees.

53.    Steven Miller's communications were with George Savage, the auditor identified on the 2023 Audit, Mark Zeh, Senior Auditor, and Deborah Ricker, Senior Financial Analyst, Billing Resolution and Collections.

54.    Upon information and belief, Mr. Savage is employed by HICM.

55.    Upon information and belief, Mr. Zeh is employed by The Hartford Insurance Group, Inc.

56.    The written communications relating to the 2023 Audit, its purported findings, and subsequent invoices seeking the additional premium, were from Ms. Ricker, who communicated with correspondence referring to her employer generically as "The Hartford" and bearing the address "690 Asylum Avenue, Hartford, CT 06155."

57.    Defendants, through Messrs. Savage and Zeh and Ms. Ricker, insisted to Steven Miller that the reclassification of Sciolex's employees was appropriate due to their work environment and duties.

58.    In response, Steven Miller produced documentation demonstrating that Sciolex's PACTS II employees performed exclusively clerical duties in low-risk environments and were most appropriately classified as Clerical, just as they had been classified for four full policy periods prior to the stated audit period.

59.    At some point during the communications between Steven Miller and Messrs. Savage and Zeh and Ms. Ricker, it became clear to Steven Miller that part of the basis for the Defendants' reclassification was an internet search showing the exteriors of the Sciolex facilities in California, Vermont and the District of Columbia, which the auditor concluded looked like warehouse buildings, without regard to the fact that the interior of those facilities were built out as traditional office space with cubicles where employees performed traditional clerical duties.

60.    In written correspondence, telephone calls and virtual meetings, Defendants, through their agents, refused to meaningfully consider the documentation provided by Steven Miller and further refused to retract its classification of Sciolex's employees as Warehouse, to return the classification of Sciolex's employees to Clerical or to retract its wrongful retroactive and exorbitant premium charges.

61.    Defendants, through their agents, instead threatened Sciolex with a collection action in an effort to intimidate, harass and coerce Sciolex to pay the additional premium.

62.    Defendants, through their agents, engaged in this conduct knowing that the reclassification was erroneous and that their related premium charges were wrongful.

63.    During the meeting on or about February 20, 2025, Steven Miller, on behalf of Sciolex, explained why the Warehouse classification was inaccurate. At one point during the meeting, Steven Miller momentarily turned off his camera and stepped away from his computer. Upon his return, he overheard a discussion among Messrs. Savage and Zeh and Ms. Ricker wherein Ms. Ricker, in sum and substance, stated to her colleagues: "this doesn't seem right here. This seems wrong. I wish we had spoken with him [referring to Steven Miller] sooner." Mr. Zeh then responded: "Yeah, I know." Nonetheless, and despite these admissions by Ms. Ricker and

ME1\59407226.v8

Mr. Zeh, the Defendants, through their agents, refused to retract the reclassification and premium charges and insisted on full payment thereof.

64.     Defendants have also refused to provide any documentation supporting the conclusion of the 2023 Audit that Sciolex's workforce should be classified as "Warehouse" during the final policy period, but not for the other years in which the Defendants and their agents conducted audits of Sciolex yet reached no such conclusion.

65.     As of the filing of this Complaint, Defendants have chosen to ignore Sciolex's requests for information and documents as well as Sciolex's own offered documentation supporting its position that the PACTS II employees were wrongfully reclassified and/or misclassified.

66.     The Hartford has instead continued to seek collection of the additional premium balance of $1,695,983.00.

67.     On or about December 16, 2025, Sciolex sent a letter to Messrs. Savage and Zeh and Ms. Ricker on behalf of the Defendants demanding that they "(i) retract, in writing, and release, with prejudice, its claim for additional premium payments; and (ii) reimburse Sciolex the sum of $65,000, previously paid by Sciolex on August 10, 2023." The December 16, 2025 letter demanded a favorable response no later than January 6, 2026. As of the filing of this Complaint, Sciolex has been assured that its letter has been forwarded to The Hartford's Legal Department and to its outside counsel but has received no further response and certainly no assurance that The Hartford will reverse and withdraw its demand for payment of the additional premium.

### COUNT I (DECLARATORY JUDGMENT)

68.     Sciolex restates and realleges the Factual Allegations Common to All Causes of Action as if fully restated herein.

69.     Sciolex has no obligation under the Policies to pay the additional premium retroactively assessed by the Defendants through their agents because it is based on the wrongful reclassification of the PACTS II employees as Warehouse, causing improper and artificially inflated premiums.

70.     Based upon their duties and actual exposure, the PACTS II employees are properly classified as Clerical.

71.     The Defendants, through their agents, maintain that Sciolex has an obligation to pay the additional premium, has disputed and continues to dispute that the PACTS II employees were wrongfully reclassified, and has refused to reverse or retract their demand for payment of the wrongfully assessed premium charge.

72.     A *bona fide* and actual controversy exists between Sciolex and the Defendants with respect to Defendants' wrongful reclassification of the PACTS II employees as "Warehouse," rather than "Clerical" and whether Sciolex is obligated to pay the additional resulting premium calculated and invoiced by them to Sciolex.

73.     There are actual, *bona fide* and substantial questions and issues in dispute and uncertainty in the legal relationship between Sciolex and the Defendants.  Sciolex has an interest, legal or equitable in nature, in determining and resolving the parties' obligations.

74.     A declaratory judgment is necessary in order to determine the foregoing controversy and to resolve that Sciolex is not obligated to pay the additional premium retroactively assessed by the Defendants and that the PACTS II employees were wrongfully reclassified as Warehouse as set forth herein.

75.     Sciolex requests a declaratory judgment from this Court determining the parties' obligations as follows:

(a)     Pursuant to the Policies, the reclassified PACTS II employees across Sciolex's California, Vermont and District of Columbia locations should be appropriately classified as Clerical, not Warehouse;

(b)     Defendants' reclassification and subsequent additional premium constitute a material breach of the Policies;

(c)     Sciolex has no obligation to pay the additional premium arising from the erroneous reclassification; and

(d)     Defendants are obligated to refund to Sciolex its payment of $65,000 made in good faith, but in error, on or about August 10, 2023.

## COUNT II (BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

76.     Sciolex restates and realleges the Factual Allegations Common to All Causes of Action as if fully restated herein.

77.     The Policies are valid, enforceable contracts.

78.     Sciolex has timely performed all of its obligations under the Policies.

79.     Implied in the Policies is a covenant of good faith and fair dealing requiring that the Defendants (i) not engage in self-dealing, (ii) not do anything that will injure or deprive Sciolex of the right to receive the benefits of the Policies, (iii) at all times make fair and good faith judgments concerning the proper classification of Sciolex's employees and its determination of premiums due, and (iv) not withhold timely and complete information concerning the grounds for its decisions concerning the proper classification of Sciolex's employees and The Hartford's determination of premiums due.

80.     Defendants materially breached the Policies, and the covenant of good faith and fair dealing implied in the Policies in one or more of the following ways:

18

(a)    By intentionally misclassifying and/or reclassifying Sciolex's PACTS II employees as "Warehouse" long after terminating a sixteen-year insurer/insured relationship;

(b)    By belatedly charging an exorbitant and improperly calculated premium to Sciolex;

(c)    By falsely representing to Sciolex that their classification of the PACTS II employees was appropriate;

(d)    By falsely representing to Sciolex that their rendering of the additional premium on May 24, 2023 was appropriate;

(e)    By failing and refusing to consider the appropriate risk profile and exposure created by the actual duties and work environment of the PACTS II employees;

(f)    By failing to provide timely and complete information concerning the basis for Defendants' belated determination that Sciolex's workforce was more properly classified as "Warehouse";

(g)    By failing to provide timely and complete information concerning the basis for their premium determination; and

(h)    By intimidating, harassing and coercing Sciolex into paying a first installment of the retroactive premium in the amount of $65,000.

81.    Defendants' material breaches of the Policies and the implied covenant of good faith and fair dealing implied in the Policies have directly damaged Sciolex.

82.    Sciolex is entitled to recover its damages from Defendants, including, but not limited to, consequential damages suffered as a result of Defendants' breaches of the Policies and the covenants of good faith and fair dealing implied in such policies.

## COUNT III (NEGLIGENT MISREPRESENTATION)

83.    Sciolex restates and realleges the Factual Allegations Common to All Causes of Action and Paragraphs 77–82 as if fully restated herein.

84.    Defendants, individually and/or through their agents, made negligent misrepresentations to Sciolex, including those set forth herein insofar as they:

(a)    Misrepresented pertinent facts and policy provisions by falsely representing to Sciolex that its reclassification of the PACTS II employees was appropriate;

(b)    Misrepresented pertinent facts and policy provisions by falsely representing to Sciolex that the additional premium based on the reclassification was appropriate;

(c)    Furnished bills to Sciolex that reflected improperly calculated premium rates; and

(d)    Attempted to collect premiums from Sciolex at a rate higher than what should be levied for PACTS II employees based upon statements concerning the appropriate classification of such employees that are untrue.

85.    Defendants knew or should have known that these representations were false.

86.    Sciolex reasonably and justifiably relied upon the representations made by Defendants, through their agents, concerning the appropriate classification of the PACTS II

employees and resulting additional premium to Sciolex's detriment; namely, by mistakenly, but in good faith, making a partial installment payment to Defendants in the amount of $65,000.

87.      Sciolex further reasonably and justifiably relied upon the representations made by Defendants, through their agents, by necessarily revising its June 11, 2024 contract bid to DHS to account for the retroactive premium.

88.      As a direct and proximate result of its justifiable reliance upon Defendants' misrepresentations, Sciolex has suffered damage by mistakenly making a payment to Defendants over and above the amount due, by losing its bid on a PACTS II RFP resulting in lost profits of approximately $3.31 million on one contract, and by losing its preferred bidder status resulting in lost future profits on future contracts.

## COUNT IV (INTENTIONAL MISREPRESENTATION)

89.      Sciolex restates and realleges the Factual Allegations Common to All Causes of Action and Paragraphs 77–82 and 84–88 as if fully restated herein.

90.      Upon information and belief, Defendants, individually and/or through their agents intentionally made false misrepresentations to Sciolex, including those set forth herein.

91.      Defendants, through their agents, falsely represented to Sciolex that their reclassification of the PACTS II employees and subsequent additional premium was proper based on the PACTS II employee's purported duties and work environment and the conditions of the Policies.

92.      Defendants, through their agents, made these false representations knowing they were untrue, without belief in their truth, or with reckless disregard for their truth and coupled them with threats of a collection action and intimidation in order to coerce Sciolex into making payment of the retroactive, inflated premium charges.

93.     The falsity of these representations is evidenced by four consecutive policy periods prior to the 2023 Audit in which Defendants and their agents classified Sciolex's PACTS II employees as Clerical, the actual duties and exposure of the PACTS II employees, the documentation provided by Sciolex to the Defendants and their agents, and the admissions of Messrs. Savage and Zeh and Ms. Ricker.

94.     Defendants' misrepresentations were intentional, willful, wanton and with reckless disregard for the rights and interests of Sciolex.

95.     Sciolex reasonably and justifiably relied upon the representations made by Defendants, through their agents, concerning the appropriate classification of the PACTS II employees and resulting additional premium to Sciolex's detriment, namely by mistakenly and in good faith making a partial installment payment to The Hartford in the amount of $65,000.

96.     Sciolex further reasonably and justifiably relied upon the representations made by Defendants, through their agents, by necessarily revising its contract bid to DHS to account for The Hartford's reassessed premium.

97.     As a direct and proximate result of its justifiable reliance upon Defendants' intentional misrepresentations, Sciolex has suffered damage by mistakenly making a payment to Defendants over and above the amount due, by losing its bid on a PACTS II RFP resulting in lost profits of approximately $3.31 million on one contract, and by losing its preferred bidder status resulting in lost future profits on future contracts .

### COUNT V (VIOLATIONS OF CUTPA AND CUIPA)

98.     Sciolex restates and realleges the Factual Allegations Common to All Causes of Action and Paragraphs 77–82, 84–88 and 90–97 as if fully restated herein.

99.     Defendants and their agents are "persons" within the meaning of Conn. Gen. Stat. § 42-110a.

100.    At all relevant times, Defendants have been engaged in the business of insurance within the meaning of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816 ("CUIPA").

101.    At all relevant times, Defendants have been, and continue to be, engaged in the conduct of trade or commerce within the meaning of CUTPA.

102.    Defendants' conduct violates CUTPA, insofar as it constitutes unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce within the meaning of Conn. Gen. Stat. § 42-110b(a).

103.    Specifically, Conn. Gen. Stat. §38a-816(1), under the title "Misrepresentations and false advertising of insurance policies," prohibits "Making, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison which: (A) Misrepresents the benefits, advantages, conditions or terms of any insurance policy …."

104.    By making, issuing or circulating a statement that misrepresents the proper and appropriate worker classification applicable to Sciolex's PACTS II employees as "Warehouse," when, under the Policy and the classification systems and rules provided by NCCI and WCIRB, they are properly and appropriately classified as "Clerical," and by charging an exorbitant retroactive premium to Sciolex based upon that wrongful classification, Defendants have misrepresented the conditions or terms of the workers compensation policies issued by them in violation of Conn. Gen. Stat. §38a-816(1)(A).

105.    Defendants' violations of Conn. Gen. Stat. §38a-816(1)(A) include the following:

(a)     Misrepresenting pertinent facts and policy provisions relating to the insurance coverage at issue;

(b)     Reclassifying the PACTS II employees from Clerical to Warehouse knowing that such reclassification was not justified;

(c)     Reclassifying the PACTS II employees from Clerical to Warehouse without conducting a reasonable investigation into the appropriateness of such reclassification based upon all of the available information;

(d)     Failing to acknowledge and act with reasonable promptness upon communications received from Sciolex, including information from Kevin Miller and Steven Miller, regarding the proper classification of Sciolex's PACTS II employees

(e)     Failing to follow the NCCI Basic Manual and the WCIRB and to implement reasonable standards for audits, including the reclassification of workers in connection with its workers' compensation insurance policies;

(f)     Misrepresenting the benefits, advantages, conditions or terms of the Policies through their wrongful reclassification and assessment of the additional premiums and subsequent representations that this conduct was appropriate under the Policies;

(g)     Charging Sciolex an improper and inflated premium following the 2023 Audit based upon their improper reclassification of Sciolex's PACTS II employees; and

(h)     Threatening Sciolex with collection actions in order to coerce Sciolex to make payment of the improper and inflated premium, including an initial payment

of $65,000 made by Sciolex in good faith and before it was aware that

Defendants' representations were unjustified and unlawful.

106.    Defendants and their agents have made a practice of engaging in the conduct at

issue in this Complaint as evidenced by *Norwalk Hous. Auth. v. Hartford Underwriters Ins. Co.*,

No. FST CV 186035460 S, 2023 WL 2386141, *1 (Conn. Super. Ct. Mar. 2, 2023).

107.    As set forth above, The Hartford's conduct:

(a)    Is unfair insofar as the injuries to Sciolex and others are substantial, it is

not outweighed by any countervailing benefits to consumers or competitors, and it

could not reasonably have been avoided by Sciolex or others;

(b)    Offends the public policy of the State of Connecticut including the public

policies that: (i) businesses deal honestly and truthfully with their customers and

(ii) businesses not use their superior economic resources to take advantage of their

customers or to maximize profits at the expense of innocent consumers; and

(c)    Is immoral, unethical, oppressive and unscrupulous, and has caused and

will continue to cause substantial injury to consumers, including Sciolex.

108.    Sciolex has suffered significant and ascertainable losses of money and property as

a direct result of Defendants' CUIPA and CUTPA violations.

109.    Sciolex is entitled to recover its compensatory and consequential losses as a result

of Defendants' violations of CUIPA and CUTPA, as previously set forth, and further is entitled

to recover punitive damages, attorneys' fees and costs.

110.    In accordance with the mandates of CUTPA, Sciolex has advised the Attorney

General of the State of Connecticut, as well as the Commissioner of Consumer Protection for the

ME1\59407226.v8

State of Connecticut, of its CUIPA and CUTPA claim against Defendants by mailing a copy of this Complaint to each respective office.

## PRAYER FOR RELIEF

WHEREFORE, Sciolex Corporation prays for relief as follows:

1.     A Declaratory Judgment from this Court determining and stating that (a) pursuant to the Policies, the reclassified PACTS II employees across Sciolex's California, Vermont and District of Columbia locations should be appropriately classified as Clerical, not Warehouse; (b) The Hartford's reclassification and subsequent additional premium constitute a material breach of the Policies; (c) Sciolex has no obligation to pay the additional premium arising from Defendants' erroneous reclassification; and (d) Defendants are obligated to refund to Sciolex its payment of $65,000 made in error on or about August 10, 2023;

2.     Damages, including compensatory and consequential damages, in excess of $75,000, exclusive of interest, costs, and attorneys' fees, resulting from Defendants' breaches of their obligations under the Policies and their tortious conduct;

3.     Common law punitive damages;

4.     Interests and costs;

5.     Costs and attorney's fees as provided by law;

6.     Punitive and exemplary damages and attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g;

7.     Prejudgment and post-judgment interest pursuant to Conn. Gen. Stat. § 37-3a; and

8.     Any further legal or equitable relief as the Court deems just and proper.

ME1\59407226.v8

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY OF ALL CLAIMS SO TRIABLE**

Dated:  January 14, 2026

PLAINTIFF: SCIOLEX, CORPORATION

By: _____

Thomas J. Rechen
Federal Bar No. 03385
trechen@mccarter.com
McCarter & English, LLP
185 Asylum St., CityPlace I
Hartford, CT 06103
Phone:  860-275-6706
Fax:  860-724-3397

Its Attorneys

ME1\59407226.v8